UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MELISSA PRICE,

    Plaintiff,

v.

BLOOMFIELD ORCHARD ACQUISITION
COMPANY, INC. d/b/a BLOOMFIELD
ORCHARD VILLA and CIENA HEALTHCARE
MANAGEMENT, INC.,

    Defendants.

Case No. 2:21-cv-12493

Hon.
Mag.

Sarah S. Prescott (P70510)
Nakisha N. Chaney (P65066)
Salvatore Prescott Porter & Porter, PLLC
*Counsel for Plaintiff*
105 E. Main Street
Northville, MI 48167
(248) 679-8711
prescott@spplaw.com
chaney@spplaw.com

## COMPLAINT AND JURY DEMAND

Plaintiff Melissa Price, through her attorneys Salvatore Prescott Porter & Porter, brings this Complaint for national origin discrimination and retaliation in violation of Title VII, 42 U.S.C. § 2000e-2 and § 2000e-3; violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.; and violation of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq*.

## PARTIES, VENUE AND JURISDICTION

1. Plaintiff resides within the Eastern District of Michigan.

2. Defendant Bloomfield Orchard Acquisition Company, Inc. ("Bloomfield Orchard") is a domestic corporation doing business as Bloomfield Orchard Villa, with its principal place of business in the Eastern District of Michigan.

3. Defendant Ciena Healthcare Management Inc. ("Ciena") is a domestic corporation with its principal place of business in the Eastern District of Michigan. Ciena is the parent corporation of multiple nursing and rehabilitation facilities over which it provides central administration, management and oversight, including over the Defendant facility, Bloomfield Orchard.

4. Subject matter jurisdiction is founded upon 28 U.S.C. § 1331, which gives district courts subject matter jurisdiction over all civil actions arising under the laws of the United States, and 29 U.S.C. § 2617, which gives federal court jurisdiction of claims raised under the Family and Medical Leave Act.

5. The events giving rise to this lawsuit occurred in the Eastern District of Michigan.

6. Venue is proper in the United States District Court for the Eastern District of Michigan, pursuant to 28 U.S.C. § 1391(b)(2), as this is the district in which the events giving rise to the claims occurred.

## GENERAL ALLEGATIONS

7. Defendants hired Plaintiff Melissa Price, a Licensed Practical Nurse, in 2013.

8. As an employee, Plaintiff was subject to the oversight and enforcement of policies, practices and authority of Bloomfield Orchard and its parent company, Ciena.

9. Plaintiff was required to sign, and did sign, a Code of Conduct, expressly providing that Bloomfield Orchard "and Ciena Healthcare Management, Incorporated has established this Code of Conduct for guiding the actions of all employees" and that the Code "sets forth the operating

philosophy of the Ciena organization and serves as a general guide to the employees in providing care to our residents."

10. Ciena represents on its corporate website that "Ciena Healthcare and its facilities are firmly committed to a high standard of ethics, integrity, professionalism and compliance as reflected in our Code of Conduct" and that they "expect our employees … to abide by the Code of Conduct when performing their jobs and duties."

11. Ciena's corporate website also states that "Ciena Healthcare has managed skilled nursing homes & rehabilitation Centers since 1998," and it refers to its facilities as "Ciena-managed facilities."

12. Bloomfield Orchard Villa, at which Plaintiff worked, is one such "Ciena-managed" facility.

13. As such Bloomfield Orchard Villa and Ciena were joint employers of Plaintiff.

14. While employed with Defendants, Plaintiff received favorable performance evaluations, including reviews rating her as "clearly outstanding," "exceptional," and a consistent "team player" who cared about the residents.

15. Moreover, in August 2018, Defendants promoted Plaintiff to Assistant Director of Nursing ("ADON").

16. As ADON, Plaintiff reported to the Administrator and Director of Nursing (DON). At various times relevant, Rod Mencer served as the Administrator and Jennifer Calvert served as DON.

17. Administrator Mencer regularly and openly denigrated African immigrants.

18. Mencer generalized Africans as illiterate, unable to read, write or speak properly, and stated that Bloomfield Orchard should rid itself of African employees.

3

19. Plaintiff, who is white, had a prior relationship with an African immigrant with whom she had a son.

20. Mencer criticized Plaintiff's involvement and relationships with African immigrants in both her personal life and in the workplace.

21. When Plaintiff opposed his hostile and prejudiced disparagement of African employees, Mencer called her stupid and nasty.

22. Mencer chided Plaintiff for being too friendly with "the Africans," and questioned and criticized her for acts of kindness toward African employees, including asking why the "other Africans" could not help instead.

23. Mencer also took considerable exception to and an inappropriate interest in Plaintiff's relationship with an African immigrant with whom she had a relationship years prior. Though she was not then dating the man, Mencer speculated that Plaintiff was sexually involved with him, and he (Mencer) pressured Plaintiff to detail her relationship with the man in multiple conversations.

24. Mencer relentlessly harassed Plaintiff because of her perceived and actual association with Africans, including screaming at her, calling her disgusting and stupid, and realigning her duties because she was, in Mencer's perception, dating "an African."

25. Mencer's conduct was so pervasive and hostile that other supervisors complained to Mencer's superiors that his behavior was deeply inappropriate, baseless, loud, aggressive, berating and belittling.

26. One former head of nursing tendered his own resignation in or around April 2019 because of Mencer's harassment of Plaintiff.

4

27. Another co-worker, after reportedly hearing Mencer stereotyping the facility's African cohort and criticizing Plaintiff for her relationship with them, complained in writing that Mencer's conduct toward Plaintiff was, "the worst case of verbal abuse and harassment I have ever heard."

28. Despite these complaints, on information and belief, senior management did not investigate or correct Mencer.

29. Likewise, when management learned of Mencer referring to a female in the workplace as a "bitch," nothing was done.

30. Meanwhile, Mencer and Calvert took steps to impede and dissuade reporting misconduct.

31. Mencer outright forbade Plaintiff from reporting her concerns to central leadership, telling her "no" when she asked to speak with corporate officers and saying she had "no right" to report concerns.

32. Ciena had a hotline through which employees could make complaints. However, Mencer called Plaintiff into his office and showed her on his computer that all the complaints go directly to Mencer from corporate. He told her the "Africans" are just wasting their time, so, if she's smart, she would tell them all to stop now because when he finds out who is complaining, they will be terminated. He also told her if another complaint comes in stating that she was being discriminated against, she would be immediately terminated.

33. Mencer and Calvert also threatened staff that if anyone in the facility reported anything amiss to corporate, they would be made examples of, if they had a job at all.

34. Mencer and Calvert made good on these threats, including retaliation against individuals who reported misconduct to their superiors.

35. As applied to Plaintiff, the Defendants began papering her personnel file upon learning of her seeking legal counsel to address her concerns and seeking her personnel file. This retaliation increased over coming weeks.

### Plaintiff is Retaliated Against for Proper Use of FMLA Leave

36. Plaintiff sought the reasonable accommodation of intermittent leave time for a recognized disabling condition related to kidney disease.

37. Plaintiff qualified for this reasonable accommodation and the Defendants further approved FMLA leave for the condition from August 2019 to August 2020.

38. The FMLA certification showed a need for leave monthly or when the medical condition flares up.

39. Plaintiff needed to use her leave time when her condition flared, necessitating her absence and hospitalization in 2019.

40. At the time of her request, Plaintiff was eligible and approved for FMLA time, she had not exhausted her 12-week bank of leave time, and Defendants had not requested any sort of recertification.

41. Plaintiff or (when she was unable to because of her condition) her family timely notified Plaintiff's supervisor of her hospitalizations and the need for absence and use of FMLA.

42. Defendants time records reflect that Plaintiff was approved for FMLA time.

43. Nevertheless, Plaintiff was disciplined for absenteeism, i.e., for use of FMLA days.

44. Specifically, on the exact day Plaintiff returned from leave, on September 19, 2019, Plaintiff was issued a Disciplinary Action Record for attendance that listed absences for days she was hospitalized or receiving treatment and approved for FMLA.

45. Defendants also put Plaintiff on a Performance Improvement Plan.

46. Moreover, while Plaintiff was on job-protected FMLA leave, Defendants posted Plaintiff's job and Calvert began lining up interviews of candidates to replace Plaintiff.

47. On October 7, 2019, Plaintiff, through her counsel, complained of the above behavior, a protected act that reported the discriminatory harassment and retaliation, unlawful under state and local anti-discrimination laws and as violations of the Family and Medical Leave Act.

48. On or around October 14, Plaintiff reported the wrongful treatment to the head of Human Resources.

49. In retaliation, on October 17, Plaintiff was falsely accused of misconduct related to administering TB tests, tests that had been conducted months earlier with no concern, complaint or issue in the interim.

50. Plaintiff was suspended.

51. On October 23, 2019, Defendants terminated Plaintiff.

52. On July 14, 2020, Plaintiff filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission.

53. Furthering retaliation, Defendants in response reported spurious allegations of misconduct by Plaintiff to the State of Michigan's Department of Licensing and Regulatory Affairs ("LARA").

54. Defendants' retaliatory complaint had potentially devastating long-term consequences on Plaintiff's life, financial stability and career. In the short-run, Plaintiff was unable to find work in the nursing field while under investigation, and she was forced to retain counsel to fight the false and retaliatory charges.

55. Ultimately, but at a cost, Plaintiff was successful in having the charges dismissed, and, on January 5, 2021, LARA rightfully dismissed the charges without action against Plaintiff's license.

56. In February 2021, Plaintiff filed a second charge with the EEOC for retaliation.

57. On August 31, 2021, the EEOC issued a right to sue for both charges. Plaintiff timely filed this action.

## COUNT I
## NATIONAL ORIGIN DISCRIMINATION
### Title VII, 42 U.S.C. § 2000e-2

58. Plaintiff incorporates here all previously stated allegations.

59. Plaintiff was an employee of Defendants at times relevant.

60. Defendants were employers of Plaintiff at times relevant.

61. Defendants intentionally subjected Plaintiff to severe and/or pervasive harassment and discriminatory treatment because of her association and relationships with African immigrants, including being subjected to a hostile work environment, criticized, disparaged, berated, and having duties realigned to punish her.

62. Defendants had knowledge of the harassment and discrimination because it was carried out by and in front of managerial staff and was reported repeatedly, both by Plaintiff and another former colleague, including to the Director of Human Resources and Associate General Counsel.

63. Defendants failed to investigate and take remedial action and, instead, fired Plaintiff and attempted to ruin her career with a retaliatory licensing action.

64. As a direct and proximate cause of the foregoing, Defendants caused Plaintiff damages including, but not limited to, the loss of earnings and earning capacity, mental and emotional

distress including severe mental anguish, humiliation and embarrassment; physical distress; and the loss of the ordinary pleasures of everyday life.

## COUNT II
## RETALIATION
### Title VII, 42 U.S.C. § 2000e-3

65. Plaintiff restates and incorporates here all previously stated allegations.

66. Plaintiff engaged in protected activities when she sought legal counsel to assist her, sought her personnel file, opposed and reported discriminatory harassment and retaliation and when she filed a charge with the EEOC.

67. Defendants knew about Plaintiff's protected activity.

68. Defendants retaliated against Plaintiff because of her protected activity, including deepening harassment, unwarranted write ups, ignoring its own policies and procedures when applied to her, papering her file, suspending and terminating her and making spurious allegations of misconduct to the state licensing agency.

69. As a direct and proximate cause of the foregoing, Defendants caused Plaintiff damages including, but not limited to, the loss of earnings and earning capacity, mental and emotional distress including severe mental anguish, humiliation and embarrassment; physical distress; and the loss of the ordinary pleasures of everyday life.

## COUNT III
## FMLA RETALIATION
### Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*

70. Plaintiff restates and incorporates here all previously stated allegations.

71. Plaintiff was engaged in statutorily protected conduct when she was absent from work because of and to obtain treatment for a serious health condition for which she had approved FMLA time.

9

72. Defendants knew Plaintiff was asserting and exercising her FMLA rights.

73. Defendants retaliated against Plaintiff for exercising those rights by disciplining her, putting her on a performance improvement plan, and when she complained about the retaliation in writing through counsel, immediately terminating her.

74. As a direct and proximate cause of the foregoing, Defendants caused Plaintiff damages including, but not limited to, the loss of earnings and earning capacity, mental and emotional distress including severe mental anguish, humiliation and embarrassment; physical distress; and the loss of the ordinary pleasures of everyday life.

## COUNT IV
## DISABILITY DISCRIMINATION AND RETALIATION
## Americans with Disabilities Act, 42 U.S.C. 12101, *et seq.*

75. Plaintiff restates and incorporates here all previously stated allegations.

76. Plaintiff suffers serious chronic medical conditions relating to kidney disease, of which Defendants are aware.

77. Her longstanding condition affects her daily living including rendering her wholly incapacitated and requiring hospitalization when it flares up. Even when in remission, her condition affects a major bodily function, which is in general all of the functions of a human kidney.

78. The severity of the conditions can flare, which has necessitated, over the years, that Plaintiff take short intermittent leaves for treatment and recovery.

79. As such, Plaintiff is a person protected under the ADA because she is disabled, is regarded as disabled, and/or because she has a history of disability.

80. With or without accommodation, Plaintiff has always been well-qualified for her position, as evidenced by her performance evaluations and promotion to Assistant Director of Nursing.

81. Plaintiff requested accommodation in writing and used additional time for treatment and recovery when her medical condition flared.

82. Requesting such accommodation is a protected act, as is taking the accommodation once requested.

83. Defendants punished Plaintiff because she exercised her federally protected rights, such as requesting accommodation, including by issuing a disciplinary write up and putting her on a performance improvement plan.

84. Defendants also posted Plaintiff's job and interviewed replacements while she was exercising her federally protected rights, and they fired her shortly after her return.

85. In doing so, Defendants discriminated against Plaintiff because of her disability.

86. Defendants further denied her reasonable accommodation by punishing her for use of reasonable accommodation, and by terminating her.

87. Defendants further retaliated against her when she sought leave to treat her conditions, as set forth above.

88. As a direct and proximate cause of the foregoing, Defendants caused Plaintiff damages including, but not limited to, the loss of earnings and earning capacity, mental and emotional distress including severe mental anguish, humiliation and embarrassment; physical distress; and the loss of the ordinary pleasures of everyday life.

## RELIEF REQUESTED

Plaintiff seeks all available relief, including but not limited to:

   a. lost wages, benefits, perquisites, including as increased since her separation

   b. any other compensatory economic and all non-economic damages;

   c. statutory, liquidated and punitive damages; and

   d. attorney fees and costs.

|  |  |
|---|---|
|  | Respectfully submitted, <br> SALVATORE PRESCOTT <br> PORTER & PORTER, PLLC |
|  | /s/ Sarah S. Prescott <br> Sarah S. Prescott (P70510) <br> Attorneys for Plaintiffs <br> 105 East Main Street <br> Northville, MI 48167 <br> (248) 679-8711 |
| Dated: October 22, 2021 | prescott@spplaw.com |

## JURY DEMAND

Plaintiff demands a jury trial in the above-captioned matter.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | SALVATORE PRESCOTT <br> PORTER & PORTER, PLLC |
|  | /s/ Sarah S. Prescott <br> Sarah S. Prescott (P70510) <br> Attorneys for Plaintiff <br> 105 East Main Street <br> Northville, MI 48167 <br> (248) 679-8711 |
| Dated: October 22, 2021 | prescott@spplaw.com |